## Western Union Cold Storage Co. v. L. R. Warner et al.

1. VERDICTS—*Against the Weight of the Evidence.*—A judgment founded upon a verdict which is manifestly against the weight of the evidence will be reversed.

Assumpsit, for warehouse charges. Trial in the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge, presiding. Verdict and judgment for defendant, on a plea of set-off. Appeal by plaintiff. Heard in this court at the March term, 1898. Reversed and remanded. Opinion filed October 27, 1898.

MASTERSON & HAFT, attorneys for appellant.

STERN & LOUER, attorneys for appellees.

MR. JUSTICE ADAMS delivered the opinion of the court.

This was an action of assumpsit by appellant against appellees, who pleaded the general issue and gave notice of set-off under said plea. The jury found a verdict for the defendant as follows: "We, the jury, find the issues for the defendant and we assess the defendant's damages at the sum of five hundred dollars ($500) *in excess of plaintiff's storage charges twenty-one hundred and eighty-two* $\frac{43}{100}$

($2,182.43).'' The court struck out of the verdict all that part of it in italics, overruled appellant's motion for a new trial, and rendered judgment on the verdict as amended.

Appellant's claim was for the storage of apples, and appellees' claim was for damage to the apples by reason of the alleged negligence of appellant. The storage charges were proved to be $2,182.95. Forty warehouse receipts were introduced in evidence by appellees. The following is a sample copy of the receipts:

" Section A.                                No. 6163.
Room 22 & 8.                           Lot 8900 & 8907.

WESTERN UNION COLD STORAGE CO.

Western Warehouses, State and Michigan Sts., North Side.
Union Warehouses, State and 16th Sts., South Side.

Storage :                                Lot 8900   1 bbl.
Ten cents per barrel, per month       "  8907 40   "
                                                 ——
                                                 41

CHICAGO, 30 Nov., 1894.

Received for storage in Produce Warehouse A, subject to conditions printed on back of this warrant, 41 (forty-one) barrels from ......................... said to contain apples, and will deliver the same to the order of Warner & Bogart upon payment of all charges and the surrender of this warrant properly indorsed.

                    WESTERN UNION COLD STORAGE CO.
                              By LeGRAND SMITH,
                                         Treasurer.

Countersigned : H. W. GRISWOLD,
                         Assistant Secretary.
                              Ex. 40.

Indorse here ........................

All storage taken by this company subject to the following terms :

It is agreed that all loss or damage to property occasioned by fire, water, leakage, vermin, ratage, breakage, accidental or providential causes, riot or insurrections, or to perishable property, is at owner's risk. Loose fish, loose meat and any

class of goods not properly packed, at owner's risk. Not responsible for shrinkage in weights.

This company will provide any desired temperature, but will not be responsible for results.

Warehouse receipts must accompany delivery orders.

No goods delivered without."

The apples were stored in eight different rooms, numbered, respectively, 8, 18, 19, 20, 22, 60, 61, 76.

The receipts show 5,356 barrels delivered to appellant at various times from October 20, 1894, till November 30, 1894, both dates inclusive. Indorsements on the backs of the receipts show that the apples were taken from the warehouse by appellees in the months of December, 1894, and January, February, March and April, 1895. Only about thirteen barrels were so taken in December, 1894. More than 3,763 barrels were taken from the warehouse in April, 1895.

Appellees' claim is that appellant agreed to keep the apples stored at a temperature of about thirty-three degrees above zero, and that, by reason of appellant permitting the temperature in the rooms where the apples were stored to vary considerably from that temperature, the apples were damaged. It was incumbent on appellees to prove by a preponderance of the evidence the alleged agreement as to the temperature; that the temperature varied as claimed by the neglect of appellant, and that the apples were damaged by such variation; and also, if they were so damaged, to produce evidence from which the jury could, at least approximately, estimate the damage. There is no evidence sufficient, in our opinion, to justify a verdict finding that the apples were damaged by reason of a variation of temperature in the rooms in which they were kept. The only witness whose testimony can be claimed as approximating proof that the apples were damaged by that cause, is Robert Wells, who was employed by appellees to inspect and sort apples at the warehouse. He says that in room 17 he noticed that the temperature was thirty-seven degrees and that the apples sweated in that room. There is no evidence that a temperature of thirty-seven degrees would cause sound apples to

sweat. The witness says he noticed particularly in, room number 11, but there is no evidence that any of appellee's apples were stored in that room. The receipts give the numbers of the rooms in which the apples were stored, and room number 11. is not one of them. The witness also testified that he had no specific recollection of the temperature of any rooms except 17 and 11. The receipts show that but a small proportion of the barrels were stored in room 17. Gibson, a witness for appellees, having testified as to the poor condition of the fruit, Newhall, who had been in the fruit business for sixteen years, and who testified that during the last ten years he had handled from 50,000 to 125,000 barrels of apples per year, was questioned and answered as follows (we quote from abstract):

" Mr. Haft: Taking the condition and kind as you saw them, and as you heard Mr. Gibson testify, state what time they could be carried in a temperature of thirty-three degrees.

" A. I would say I probably would not have put them in cold storage at all. I think a sale of the apples about some time in January would have been the proper thing.

" The Court: If those apples had been put in as described and the temperature maintained at thirty-three degrees, how long would they last?

" A. A part of them, I should say not over a month, and part six months, six to seven months.

" Mr. Haft: What variety of apples would last six or seven months?

" A. The Baldwin, the Russet and the Spy of good quality—those that were good. Those that were poor or any wind-falls would not have lasted that long, or anywhere near it. Mixing bad and good apples would have a bad effect upon the good apples. Bruising an apple shortens its life greatly."

The evidence not only fails to prove that variations from the alleged agreed temperature caused the damage, but it tends strongly to prove that the damage was due to other causes.

N. G. Gibson, salesman for Newhall and Son, a witness for appellees, and who had been in the apple business for twelve or fourteen years, and had examined the apples in store, testified as follows:

"Some apples were very small, some wormy fruit, rough apples, and some very fine or decayed in the same barrel. There were wind-falls in those barrels. A wind-fall is an apple bruised by falling to the ground. A wind-fall will not keep; it bruises the apple—causes it to deteriorate. Some apples will keep in cold storage a month or six weeks and some six months. I did not see the Greenings until January, and we always considered that they should be out of the market in January, or by that time, and the Tallman Sweets and Snows about the same, because they will not keep longer. Baldwin should be out by May. Northern Spies depend upon the apple. I do not consider the North-ern Spies, stored by the defendants with the plaintiff, as a good keeping lot of apples. What I saw needed selling at the time I examined them in January. The Northern Spies I saw there would not keep more than three months in stor-age. The lapse of time between the picking of the apples and storing it has a bad effect on it. I should think the quality of Ben Davis I saw there would not hold up more than two or three months from the time they were picked. It would be better still if they were sold at the time they were picked. Jonathans should all be sold before I exam-ined those in January. If an apple is kept beyond its time it will rot."

"Q. Assuming that in March and April these apples that you saw in January were shown to have been rotting and decaying, state whether or not you would attribute that rotten condition to the over time that they were held in storage or to the poor condition that they were in at the time they were packed, or to their packing, or anything of that kind."

"A. I would attribute it to both. Some should never have gone in in the first place, and some were held beyond the time they should have been. A wind-fall should never

be placed in storage. Mixing poor apples and good apples in a barrel together interferes with the keeping of the whole barrel. They decay, and that affects the sound apples in the same barrel."

On the hypothesis that the apples, or some of them, were damaged as claimed by appellees, the evidence contains no data from which the damage can be estimated.

Gibson testified that he would consider the market value of the apples in January from $1.50 to $3.50 per barrel, and that, if sound, they would be worth from $2.25 to $3.50 per barrel; but he also testified that some were sound and good fruit, and some decayed, and that, irrespective of decay, some were quite good' apples and some rather poor. He failed, however, to testify as to the proportion of the apples worth $1.50 per barrel and the proportion worth $3.50 per barrel, and the proportion sound and the proportion decayed—elements absolutely essential to an intelligent estimate of damage. The evidence of appellee Bogart as to what the apples cost and the market value when sold, was incompetent. The cost of the apples to appellees is immaterial; their right would be the same if the apples had been given to them, and Bogart's testimony shows that he knew nothing of his own knowledge of the cost or the market value of the apples. This witness also testified that he did not know how many barrels of the apples sold were good or how many were bad. We think the verdict is not supported by the evidence.

As there must be a new trial of the cause, we think it proper to consider certain objections made by appellant on the trial.

Appellee Bogart testified that, prior to the storage of the apples, he had a conversation with Mr. Hook with reference to the temperature, and that Mr. Hook during that conversation gave him, for his information, a certain memorandum book with printed matter at the top of each page, and also a circular letter. The memorandum book purports to be issued by the Western Refrigerating Co., a cold storage company, and we do not find anything in it relevant to the

issues in the case. The circular contains the following statement : "We can give you temperatures as desired in our freezing rooms from 10 below to 10 above zero, and in our cooling rooms from 32 to 40 above zero." Appellant's counsel urge two objections to the admission in evidence of the circular: First, that a verbal agreement as to the temperature is inadmissible, and, second, that the circular purports to be issued by the Produce Cold Storage Exchange, and not by appellant. The first objection was settled adversely to appellant in Western Union Cold Storage Co. v. Ermerling, 73 Ill. App. 394, which was a similar case. As to the second objection, the above quoted statement in the circular is not inconsistent with the conditions printed on the warehouse receipts as to temperature, and if the circular was given by appellant's superintendent to appellee Bogart, during a conversation between them as to the temperature to be provided, we think the circular was properly admitted in evidence.

The witness Cullen produced a paper purporting to show the temperature of certain of the rooms in appellant's warehouse in which the apples were stored, from April 17th to April 23d, both inclusive, and testified that he made the entries at the date shown on the paper, and that they were correct. The paper was admitted in evidence over the objection of appellant. Technically this was error. The paper could only be used for the purpose of refreshing the memory of the witness.

Appellant excepts to the refusal by the court of the following instruction :

"The court instructs the jury that the burden of proof is on the defendants to establish their defense by a preponderance of the evidence."

Appellant was entitled to have an instruction given, if requested, that it was incumbent on appellees to prove their claim for damages, as stated in their notice of set-off, by a preponderance of the evidence, but we are not prepared to hold that the refusal of the instruction asked was error.

Appellees' instruction is excepted to.

What appellant offered to do by the statement in the warehouse receipts, was a question to be determined by the court, and should have been so determined. We would not, however, regard the leaving that question to the jury sufficient of itself to warrant a reversal of the judgment. There was evidence in the case tending to show that variation in the temperature of the rooms from thirty-three degrees may have been caused, at least in part, by the employes of appellees keeping the doors of the rooms open while removing barrels therefrom, and the instruction should have been so framed as to exclude appellant's liability for damage occasioned by variations in the temperature, if any, caused by appellees. The jury should have been instructed as to the measure of damages on the hypothesis that the jury would allow and assess damages in favor of appellees.

The judgment will be reversed and the cause remanded.